**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PAUL PERKINS, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-06-2405 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Paul Perkins ("Plaintiff," "Perkins") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #28; Defendant's Cross Motion and Memorandum for Summary Judgment ["Defendant's Motion"], Docket Entry #24). Defendant has also filed a response to Plaintiff's motion. (Defendant's Response, Docket Entry #31). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be DENIED, and that Plaintiff's motion be GRANTED, in part. It is further RECOMMENDED that this case be remanded for further development on the issue of Perkins's mental impairments.

**Background**

On August 26, 2003, Paul Perkins filed applications for both Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and for

Supplemental Security Income ("SSI"), under Title XVI of the Act.[1]  (Transcript ["Tr."] at 8, 110).

In his application, Perkins claimed that he had been unable to work since August 20, 2003, due to

arthritis in his hands, hips, and back, as well as depression.  (Tr. at 110, 143).  On October 28, 2003,

the SSA decided that Perkins was not disabled under the Act, and so the applications were denied.

(Tr. at 48).  Plaintiff petitioned, unsuccessfully, for a reconsideration of those decisions.  (Tr. at 49,

79).  He then requested a hearing before an administrative law judge ("ALJ").  (Tr. at 84).  That

hearing took place on October 5, 2004, before ALJ Lantz McClain.  (Tr. at 525).  Plaintiff appeared

and testified at the hearing, and he was accompanied by his attorney, Donald Dewberry ("Mr.

Dewberry").  (*Id.*).  In addition to Perkins, the ALJ heard testimony from Lorie McQuade ("Ms.

McQuade"), a vocational expert witness.  (*Id.*).

On October 28, 2004, the ALJ engaged in the following five-step, sequential analysis to

determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact,

disabled:

1.   An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

---

[1] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that he is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, Perkins has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that Perkins is able to perform other work that exists in the national economy. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving

3

significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Perkins suffers from "back and hand problems." (Tr. at 40).  Although he determined that these impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.  (*Id.*).  The ALJ then assessed Perkins's residual functional capacity ("RFC"), and found that he was not precluded from a return to his previous work as a glass installer, service dispatcher, and shop supervisor.  (Tr. at 41).  He concluded that, because he can return to his previous work, Perkins was "not under a 'disability' as defined in the Social Security Act, at any time through the date of the decision."  (*Id.*).  With that, he denied his applications for benefits. (*Id.*).

On November 9, 2004, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 27).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not

supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470.  On March 17, 2006, the Appeals Council denied Plaintiff's request, concluding that no reason for review existed under the regulations.  (Tr. at 10). With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On May 5, 2006, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Original Complaint ["Complaint"], Docket Entry #1).  Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Defendant's motion for summary judgment be denied, that Plaintiff's motion be granted, in part, and that this case be remanded for further development on the issue of Perkins's mental state.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564

(5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).   In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**Discussion**

In his lawsuit, Plaintiff claims that he is disabled because of hand, back, hip, and knee pain, as well as an anxiety disorder and severe depression.  (Plaintiff's Motion at 1).  He asks this court to reverse the Commissioner's decision to deny him disability benefits, and to render a judgment in his favor, because "[t]he findings of fact of the Secretary are not supported by substantial evidence and are contrary to the law and facts."  (Complaint at 2).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Motion at 3-5).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records available are from Sun Belt Regional Medical Center, a hospital to which Perkins was admitted, from July 13-16, 1987, due to his complaints of back pain.  (Tr. at 188-94).  While in the hospital, Perkins was treated by Dr. W.F. Donovan ("Dr. Donovan"), an orthopedic surgeon.  (*See id.*).  According to the records, Perkins presented to the hospital suffering from a severe spasm in the lower back.  (Tr. at 188).  A CAT scan was taken of his back, which revealed a "bulging disk." (Tr. at 188-89).  Perkins was diagnosed with an acute lumbosacral sprain,

6

for which he received two epidural steroid injections.  (Tr. at 188).  Perkins was discharged with prescriptions for pain medications, and a lumbosacral corset[2] to use when walking.  (*Id.*).

The next medical records show that Perkins was evaluated and treated at the Pasadena Substance Abuse Clinic from August 31, 1992, through May 6, 2004.[3]  (Tr. at 315-16, 324-35, 495). On July 8, 1997, Perkins underwent a physical examination at the clinic, and he was found to be "normal," aside from reported arthritis in his right knee and a suspected addiction to opiates.  (Tr. at 315-16).  On March 3, 1999, the clinic ordered a drug test, which showed that Perkins tested "positive" for the presence of methadone and benzodiazepines in his system.  (Tr. at 314).  Routine exams taken during this period revealed that Perkins was, in fact, addicted to methadone and benzodiazepines, and that he suffered from insomnia, nausea, stomach aches, weakness, and restlessness.  (Tr. at 326-31).  On July 22, 2003, Dr. Andrew Johnson ("Dr. Johnson"), the clinic's Medical Director, initiated a treatment plan which called for Perkins's withdrawal from methadone. (Tr. at 332-33).  The plan included individual, bi-monthly counseling sessions and attendance at 12-step meetings, as well as routine medical care, when necessary.  (Tr. at 332, 334-35).  On September 16, 2003, Dr. Johnson reported that Perkins was suffering from the symptoms of methadone withdrawal.  (Tr. at 331).  On November 18, 2003, Dr. Johnson reported that Plaintiff was "doing well," although he continued to test positive for benzodiapine, and he noted that Perkins was scheduled for a psychological follow-up appointment with the Mental Health and Mental Retardation Authority of Harris County ("MHMRA").  (Tr. at 329).  Finally, on June 25, 2004, Dr.

---

[2] A "lumbosacral corset" is a garment worn around the torso to support "the lumbar vertebrae and the sacrum." *See* MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 961 (5th ed. 1998).

[3] Although this is a physician's comment that Perkins began treatment at the Pasadena Substance Abuse Clinic in 1992, the earliest record from the clinic is dated July 8, 1997.  (*See* Tr. at 315-16, 495).

7

Johnson remarked  that Perkins had "been under methadone maintenance treatment for opiate addiction" at the clinic through May 6, 2004.  (Tr. at 495).

The records also show that Perkins was hospitalized at Memorial Hospital Southwest, for chemical detoxification, between September 5 and September 19, 1995.  (Tr. at 196-220).  While at the hospital, he was treated by Dr. Jorge Raichman ("Dr. Raichman"), a psychiatrist.  (*See id.*). Those records detail a  long history of chemical dependency, including information that Perkins and had been using methadone and marijuana daily for the past 12 years.  (Tr. at 196).  In his discharge summary, Dr. Raichman stated that Perkins was also suffering from anorexia, emphysema, hyperlipidemia, and hypertension.  (*Id.*).  He reported further that Perkins "has become more depressed with crying spells, death thoughts, and feelings of poor motivation, lack of interest." (*Id.*). While in the hospital, Perkins was treated for chemical dependence with a combination of medication and counseling.  (*Id.*).  During his stay, Perkins was also treated by Dr. Kiran Ghandi ("Dr. Ghandi"), an internist.  (Tr. at 201-03).  Dr. Ghandi found that Perkins suffered from back pain, but that he had "no radiculopathy symptoms suggestive of pain going down on the lower extremities" and "no tingling or numbness." (Tr. at 201).  Perkins was ultimately released from the hospital with instructions to continue his regimen of detoxification medications; to return to Dr. Raichman for outpatient psychiatric treatment; and to participate in follow-up care sessions.  (Tr. at 196-97).  Dr. Raichman reported that Perkins was happy to be off methadone, but that his prognosis was "guarded." (Tr. at 197).

Between July, 1996, and April, 2004, Perkins was treated by Dr. Luis Sabatini ("Dr. Sabatini"), an internist, for a variety of illnesses.  (Tr. at 483-94).  On July 15, 1996, Dr. Sabatini treated Perkins for insomnia, which he theorized was due to anxiety and depression.  (Tr. at 494).

On October 27, 1997, Perkins saw Dr. Sabatini for pain in his upper arm, as well as for his continued sleep disturbances.  (Tr. at 493).  At that appointment, Dr. Sabatini recommended that Plaintiff see an orthopedic specialist for his back pain.  (*Id.*).  On May 22, 1998, Dr. Sabatini treated Perkins for a urinary tract infection, back pain, and insomnia.  (Tr. at 489).  Four days later, at Perkins's request, the doctor prescribed Vicodin to help ease his  lower back pain.  (*Id.*).  On June 1, 1998, apparently because his lower back pain continued, a bilateral renal ultrasound was performed.  That test did not reveal any abnormalities.  (Tr. at 488).  At a follow-up appointment on June 4, 1998, Perkins still complained of lower back pain, and Dr. Sabatini prescribed further medications.  (Tr. at 487).  On April 29, 1999, Dr. Sabatini treated Perkins for a respiratory infection.  (Tr. at 486).  Records dating from June, 2000, through March, 2001, show that Perkins complained to Dr. Sabatini about arthritis in his hand, anxiety, panic attacks, and depression.  (Tr. at 388-92).  On March 20, 2003, Perkins returned to Dr. Sabatini, complaining of arthritis in his fingers and other joints.  (Tr. at 387).  An x-ray of Perkins's hands, taken March 21, 2003, revealed  mild-to-moderate bilateral degenerative joint disease of the hands and wrists, as well as a "[s]mall calcification projecting within the radial carpal joint of the right wrist."  (Tr. at 394).  X-rays of his hips and right knee, taken the same day, revealed no abnormalities.  (Tr. at 393).  On March 28, 2003, Perkins also complained about pain in his right leg and back.  (Tr. at 386).  At a number of appointments throughout the remainder of 2003, Perkins complained of pain in his lower back and hands, depression, and anxiety.  (Tr. at 384-85).

In 2004, Perkins continued to suffer from back pain.  (Tr. at 483-44).  On April 7, 2004, Perkins was also treated for pain in his hip, in both hands, and in some of his fingers.  (Tr. at 483).

In addition, Dr. Sabatini appears to have observed that Perkins was suffering from anxiety.[4]  (*See id.*).  Throughout the years that Dr. Sabatini treated Plaintiff, he prescribed medications to address both Perkins's joint pain and his mental state.

On July 25, 1996, Perkins was examined Dr. Ricque Brister ("Dr. Brister"), a psychiatrist, to whom he complained of depression and insomnia.  (Tr. at 235).  At that appointment, Dr. Brister evaluated Plaintiff's mental state, and concluded that, in addition to a methadone addiction, Perkins suffered from major depression and anxiety.  (Tr. at 235-39).  At a follow-up appointment on August 1, 1996, Dr. Brister reported that Perkins was having an easier time sleeping, and he prescribed a higher dosage of Paxil.  (Tr. at 234).  On August 15, 1996, Dr. Brister reported that the Paxil was helping Plaintiff with his anxiety.  (Tr. at 233).  On September 16, 1996, Dr. Brister reported that Perkins's insomnia had returned and that he was still experiencing anxiety, but that the "Paxil works great when he takes it."  (Tr. at 232).  The remainder of Dr. Brister's records document that Perkins's mental condition fluctuated frequently from January through June, 1998**.**  (*See* Tr. at 222-31).  In fact, Dr. Brister reported that each of the following conditions would improve and then worsen:  insomnia; daytime fatigue; poor appetite; anxiety; "feel[ing] bad"; dysphoria; agitation; anhedonia; low self esteem; thoughts of suicide or "giving up"; poor concentration; and short-term memory loss.  (*See id.*).  Dr. Brister diagnosed Perkins as suffering from  major depression, an anxiety disorder, and insomnia, and treated him with medication.  (*See id.*).

The next relevant records from this era detail Perkins's admission to the Starlite Village Hospital, for drug rehabilitation, from March through May, 1998.   (*See* Tr. at 243-95, 318-19).

---

[4] The handwriting on this chart note is difficult to decipher.

These records show that, on March 30, 1998, Perkins checked in to the hospital, voluntarily seeking

treatment for his addiction to methadone, klonopin, and marijuana.  (Tr. at 283).  The next day, he

was given a psychosocial evaluation, and was reported to have the following "problem areas":

> Inability to abstain from mood altering chemicals; need to commit to 12 step
> recovery; depressed mood; mid-life transition; financial problems; poor impulse
> control; [Adult Children of Alcoholics] issues; inability to identify and appropriately
> express emotions; present unemployment.

(Tr. at 285).  Dr. Francis Seale ("Dr. Seale"), a psychiatrist, implemented a detoxification plan which

included a gradual withdrawal from methadone and benzodiazepine, medications, vitamin

supplements, individual counseling, and group therapy.  (Tr. at 282, 290-92).  On April 24, 1998,

Perkins underwent another psychosocial evaluation by  Dr. Sean Connolly ("Dr. Connolly"), a

psychologist.  (Tr. at 254-56).  Dr. Connolly concluded that Perkins suffered from methadone and

klonopin dependence, as well as from an "adjustment disorder, with mixed anxiety and depressed

mood."  (Tr. at 256).  On May 4, 1998, Perkins was discharged from the hospital, having been

"[t]otally detoxed."  (Tr. at 244-45).  Plaintiff was instructed to take Serzone and Naltrexone, to

participate in an Alcoholics Anonymous or Narcotics Anonymous group, and to meet with a Starlite

after care counselor on a regular basis.  (Tr. at 245).

On July 29, 1998, on behalf of the state, Dr. Manjul Mehra ("Dr. Mehra"), a psychiatrist,

performed a consultative psychiatric examination and evaluation.  (Tr. at 296-300).  Dr. Mehra

reported that Perkins believed that his depression was getting worse and that he was becoming more

withdrawn. (Tr. at 298).  Dr. Mehra found that Perkins "had a mildly depressed mood with a normal

affect," insomnia, and weight loss, but no suicidal ideas.  (Tr. at 297).  Dr. Mehra then diagnosed

Perkins as suffering from poly-substance dependence, for which he was in recovery.  He also

concluded that Perkins was suffering from a severe psychosocial condition, and he assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 30.[5]  (Tr. at 299).

On August 19, 1998, Dr. Mehdi Shariflan ("Dr. Shariflan") completed a psychiatric review technique form ("PRTF"), also on behalf of the state.  (Tr. at 301-13).  Dr. Shariflan found that Perkins had a major depressive disorder, and that it was "severe."  (Tr. at 301, 304).  However, based on a review of the SSA Listings for affective disorders and substance addiction disorders, he determined that the impairment did not meet or equal a listed impairment.  (Tr. at 301).  On the same date, Dr. Shariflan also assessed Perkins's mental residual functional capacity.  (Tr. at 310-13).  On the RFC worksheet, Dr. Shariflan found that Perkins was "not significantly limited" in the majority of the areas assessed.  (*Id.*).  He did find, however, that Perkins was "moderately limited" in the following areas:  understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration over an extended period; completing a normal workday and week without unreasonable interruptions resulting from mental conditions; responding appropriately to change; setting realistic goals; and making plans independently.  (*Id.*).  He did not find that Perkins suffered from any greater limitations.  (*See id.*).  Dr. Shariflan concluded, as follows:

> This claimant retains the ability to perform simple tasks; to use reasonable judgment [and] to respond appropriately to co-workers, supervisors, [and] changes in a routine work setting.

---

[5] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  A GAF score of 30 indicates that one's "behavior is considerably influenced by delusions or hallucinations or serious impairment in communications or judgment (*e.g.*, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends)."  *Id.*

(Tr. at 312).  On November 17, 1998, both the PRTF and the mental RFC assessment were reviewed and affirmed by Dr. Lyman Phillips ("Dr. Phillips"), a psychiatrist, on behalf of the state.  (Tr. at 301, 312).

On October 13, 1999, Perkins underwent surgery at the Bayshore Medical Center to remove a tumor on his right ring finger.  (Tr. at 321-22).  A biopsy was performed, and the tumor was found to be a "giant cell tumor of tendon sheath (nodular tenosynovitis)."  (Tr. at 480-81).  Perkins returned to Bayshore, years later, on April 3, 2004, after a motor vehicle accident.  (Tr. at 478).  He had a series of x-rays taken of his lumbar spine, which revealed that he had degenerative disk disease, and he was treated with pain relievers.  (*Id.*).  On May 14, 2004, Perkins had a follow-up appointment at Texas Wellcare Associates regarding his car accident injuries.  On that date, it was determined that Perkins was suffering from lumbar disk syndrome without myclopathy,[6] myospasms,[7] thoracic disk syndrome with myclopathy, and instability of sacroiliac joints.  (Tr. at 437).  Perkins reportedly  followed his treatment plan and had "progressed nicely" following the accident.  (*Id.*).

From August 16, 2000, to July 29, 2003, Perkins was under the care of  Dr. Sofiya Donskaya ("Dr. Donskaya"), a psychiatrist.  (Tr. at 337-58).  The earliest records from this period show that Plaintiff consulted  Dr. Donskaya primarily to obtain prescriptions for his psychiatric conditions.  (Tr. at 348-58).  Dr. Donskaya reported that Perkins suffered from depression, anxiety, and difficulty sleeping.  (*Id.*).  In April, 2001, Dr. Donskaya rated Perkins's GAF at 55.  (Tr. at 348).  From May,

---

[6] "Myclopathy" refers to "a degenerative condition of the muscles."  Repetitive Strain Injury Ass'n, RSI Awareness Website, http://www.rsi.org.uk/medical_glossary.

[7] A "myospasm" is a "spasm of a muscle."  *See*  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1013 (25th ed. 1974).

2001, foward, Dr. Donskaya reported that Perkins's mood was stable, and that his anxiety had decreased overall, although he was still subject to increased anxiety over outside stressors such as his financial status.  (Tr. at 337-47).

From March through June, 2003, Perkins was treated by Dr. David Randall ("Dr. Randall"), an orthopedic surgeon at East Houston Orthopedics & Sports Medicine, following a car accident in which he injured his back, hands, knees, and legs. (Tr. at 360-82).  Before their first appointment, which took place on March 28, 2003, Dr. Randall reviewed recent x-ray reports that revealed advanced arthritic changes in Plaintiff's lesser joints, and mild arthritic changes in his back.  There were no fractures, dislocations, or signs of instability.  (Tr. at 363).  Dr. Randall reported that these x-rays showed "well preserved articular cartilage" in both the hips and knee.  (Tr. at 367).  In addition, Dr. Randall found that Perkins had a "fluid range of motion of his hips."  (*Id.*).  As to Perkins's reported right knee pain, he found that his knee had a 0 to 120 degree range of motion and stable ligaments, a "trace of an effusion," medial joint line tenderness, and a "mildly positive McMurray's."[8]  (*Id.*).  Dr. Randall prescribed physical therapy for the pain in Perkins's lower back, hand, and right knee.  The therapy resulted in Perkins's knee "feeling better," as well as in some improvement to his back pain.  (Tr. at 370, 380).  Perkins then began a physical therapy program designed to improve his gait, locomotion, balance, muscle performance, range of motion, and posture, and to reduce his pain. (Tr. at 371-82).  There was some improvement, leading to Plaintiff's report that his "knee and wrist [were] feeling better," but that his back was "still hurting, especially in AM."  (Tr. at 380).

---

[8] "McMurray's" is a short form of "McMurray's sign," which is defined as "an audible click heard when rotating the tibia on the femur, indicating injury to meniscal structures."  MOSBY'S at 995.

On October 17, 2003, Perkins underwent a psychological evaluation by Dr. Mark Lehman ("Dr. Lehman"), a psychologist, on behalf of the state. (Tr. at 395-402). Dr. Lehman found that Perkins's vocabulary was "low average," that he spoke quietly and sometimes stuttered, and that the content of his speech "was coherent but not always relevant." (Tr. at 398). He reported that Perkins worried about health, finances, and having panic attacks. (Tr. at 399). He also noted that Perkins was not paranoid or delusional, and did not experience hallucinations. (*Id.*). Dr. Lehman found Perkins to be depressed and anxious, and reported that "he trembled and exhibited poor eye contact." (*Id.*). Dr. Lehman also found that Perkins was oriented to person and place, but that he did not remember the date, and that his "[m]emory functions were below expectation given his intellectual abilities." (*Id.*). He also remarked that Perkins's "[i]nsight into his current problems and judgment regarding formulating appropriate goals seemed poor." (*Id.*). Dr. Lehman diagnosed Perkins as suffering from a mood disorder due to his medical problems, polysubstance dependence, and psychological stressors related to his finances, unemployment, medical problems, and social isolation. (Tr. at 400). He also noted that Plaintiff had a panic disorder, but added that this diagnosis was based solely on Perkins's reported symptoms. (*Id.*). On that day Dr. Lehman rated Perkins's GAF at 55.[9] (*Id.*). Dr. Lehman concluded that Perkins's depression would improve with continued psychiatric or psychological therapy. (*Id.*).

On October 28, 2003, Dr. Farrell Hillman ("Dr. Hillman"), a psychiatrist, completed a PRTF on behalf of the state. (Tr. at 403-16). On that form, Dr. Hillman found that, while Perkins suffered from a mood disorder, panic attacks, and substance addiction, none of these was severe. (*Id.*). Dr.

---

[9] A GAF score of 55 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." DSM-IV at 34.

Hillman found that Perkins was only mildly limited in activities of daily living and in maintaining social functioning, concentration, persistence, or pace.  (Tr. at 413).

On the same day,  Dr. F. B. Higgins ("Dr. Higgins"), an internist, completed a physical RFC assessment of Perkins, on behalf of the state.  (Tr. at 417-24).  After reviewing Perkins's medical records, Dr. Higgins diagnosed him as suffering from arthritis.  (Tr. at 417).  He determined that Perkins could lift 50 pounds occasionally and 25 pounds frequently; that he was otherwise unlimited in his ability to push or pull; and that he could stand, walk, or sit for six hours in an eight-hour workday.  (Tr. at 418).  Dr. Higgins also found that Perkins was not limited in his ability to climb, balance, stoop, kneel, crouch, or crawl.  (Tr. at 419).  He did find, however, that Perkins's ability to handle objects was limited, because his "grip strength" had decreased.  (Tr. at 420, 424).  Dr. Higgins concluded that Perkins's alleged physical limitations were not fully supported by the evidence in the record.  (Tr. at 424).

From November 24, 2003, through August 31, 2004, Perkins received treatment through the MHMRA of Harris County, Texas, because of his depression.  (Tr. at 439-75, 500).  On November 24, 2003, Perkins was referred for treatment following his  attempt to kill himself with a rifle.  (Tr. at 439, 441).  He was diagnosed as suffering from recurrent major depression, dependence on methadone and marijuana, hypertension, and arthritis.  (Tr. at 439).  On that day he was given a GAF score of 25.[10]  (*Id.*).  Perkins was admitted to the hospital overnight, and then released to his home, with instructions to follow up with a doctor's appointment and a psychiatric assessment.  (Tr. at 439-40).  On December 9, 2003, he underwent the recommended psychiatric evaluation, which was

---

[10] A GAF score of 25 indicates that the person is experiencing a "serious impairment in communication or judgment . . . or [an] inability to function in almost all areas."  *Id.*

performed by Dr. Mina Parikh ("Dr. Parikh"), a psychiatrist.  (Tr. at 441).  Perkins was noted to be alert and calm, but also depressed and dysphoric.  (Tr. at 444).  However, Plaintiff denied having any further suicidal thoughts or other psychotic symptoms.  (Tr. at 444, 462).  Perkins was also said to have decreased motor activity on that date.  (Tr. at 444).  In addition, Perkins was observed to sometimes engage in rambling speech, to take a long time to respond in conversation, and to have limited insight and judgment.  (*Id.*).  Perkins was diagnosed as suffering from recurrent major depression, substance abuse, hypertension, and arthritis, and he was given a GAF score of 35 at that visit.  (Tr. at 445).  Plaintiff was prescribed antidepressant and antianxiety medications, as well as counseling.  (Tr. at 444, 450).  From August 27 through 31, 2004, Perkins, through a referral from MHMRA, was treated at the NeuroPsychiatric Center for "major depression recurrent severe with psychotic symptoms."  (Tr. at 496-500).

On February 3, 2004, Dr. Lehman, the state's consulting psychologist, conducted a second evaluation of Perkins.  (Tr. at 425-32).  At that interview, Perkins informed the doctor that he had recently experienced "severe depression" and had attempted suicide, and that he "continue[d] to have suicidal thoughts but denied any intent or plans."  (Tr. at 426).  Perkins explained, "I feel worthless, my life is going nowhere and I don't see a light at the end of the tunnel."  (*Id.*).  Dr. Lehman noted that Perkins's medical records referenced two prior suicide attempts, in 1973 and 1977.  (*Id.*).  The remainder of Dr. Lehman's report is largely similar to his 2003 conclusions, except that he recognized a significant deterioration in Perkins's mental condition over recent months.  In February, 2004, Dr. Lehman lowered Plaintiff's GAF score to 45.[11]  (Tr. at 427-30).

---

[11] A GAF of 45 may indicate the presence of serious mental disturbances, or of moderate social or occupational difficulties, including an inability to retain a job.  *Id.*

### *Educational Background, Work History, and Present Age*

At the time of the administrative hearing, Perkins was 52 years of age, and had a ninth grade education.  (Tr. at 32, 532).  Perkins's past relevant work experience was his job as a "glass installer," which he explained actually involved three activities.   (Tr. at 144).  He installed glass, but also acted as a  maintenance dispatcher and a shop supervisor.  (Tr. at 32, 540).

### *Subjective Complaints*

In the Daily Activity Questionnaire that he filed as part of his application for benefits, Perkins claimed that he had been unable to work since August 20, 2003, because of "depression, [and] arthritis in hands, hips and back."  (Tr. at 110, 143).  He explained that, as a result of his physical impairments, his hands cramp frequently, and he is unable to "lift things," to bend, or to walk for very long without suffering pain. (Tr. at 164).  He stated that lying down sometimes helps, but that, generally, nothing, including pain medications, "makes [his] problems better."  (*Id.*).  Perkins also reported that particularly hot or cold weather aggravates his condition.  (Tr. at 193).  Perkins stated that he rides a bike for short periods once every week or so, and that he does hand exercises using a small therapy ball.  (Tr. at 164).  Perkins reported that, on an average day, he watches television, watches his grandchildren play, sleeps a lot, and often eats just once a day. (*Id.*).  He stated that he does drive, although not at night because of "night blindness."  (Tr. at 165-67).  Perkins reported that he is usually able to bathe without difficulty, but sometimes has trouble buttoning his clothes.  (*Id.*).  Perkins stated further that he does not cook, perform household chores, do yard work, or go shopping, aside from short trips to the corner store.  (*Id.*).  In a later Daily Activity Questionnaire, however, Perkins stated that he goes shopping with his sister and that he helps to clean the house, to sweep, and to change fuses.  (Tr. at 180).

18

In regard to his mental impairments, Perkins stated, as follows:

I suffer from major depression with high anxiety + panic disorder.  Concentration span very short.  Difficult to complete a task.  I lose interest + don't complete it.  My mind wanders + I give up easily.

(Tr. at 166).  He also stated that he has suffered from memory problems for years and that they are getting worse.  (Tr. at 168).  Perkins reported that he has lost interest in doing activities which he once enjoyed, such as fishing and hunting.  (*Id.*).  Perkins also stated that he prefers to be alone, that he does not like crowds of people, and that he feels as if people are looking at him or talking about him, even though "I know they are probably not."  (*Id.*).  Finally, he stated that he cries easily and that he had "become suicidal."  (Tr. at 168-71).

At the hearing, Perkins testified that he had used Methadone for about twenty nine years, but that he had finally stopped using it in May, 2004.  (Tr. at 533-34).  He stated that his daily activities were limited to watching television, and that he has no friends and no hobbies.  (Tr. at 534).  Perkins testified that he occasionally drives a truck and that he sometimes goes to a store for cigarettes, but otherwise spends his time in the house.  (Tr. at 534-35).  Perkins testified that he had attempted suicide on three occasions, and was hospitalized each time.  (Tr. at 535).  He added that he still sometimes has suicidal thoughts.  (*Id.*).  Perkins also testified that he occasionally cries during the day, and that he sleeps for an hour or two during the day on a regular basis.  (Tr. at 536-37).  Perkins testified that he suffers from panic attacks, which last from 30 minutes to a few hours.  (Tr. at 537).  He explained that, during these attacks, his heart beats rapidly, he has difficulty thinking and talking, he starts shaking, and he "freeze[s] up."  (*Id.*).  He testified that he takes medication to control the panic attacks, as well as his other mental problems, but that it does not prevent him from

experiencing such attacks.  (*Id.*).  He also testified that he has been under psychiatric care for more than seven years.  (Tr. at 538).

### Expert Testimony

At the hearing, the ALJ heard testimony from Lorie McQuade, a vocational expert witness. (Tr. at 539-41).  Ms. McQuade remarked that Perkins's previous job actually consisted of three, separate occupations: glass installer; service dispatcher; and shop supervisor.  (Tr. at 540).  She explained that the glass installer responsibilities were medium, semi-skilled work; that the service dispatcher duties were sedentary, semi-skilled work; and that the shop supervisor duties were medium, skilled work.  (*Id.*).  Then, the following exchange occurred between the ALJ and Ms. McQuade:

> Q     . . . [L]et me give you a hypothetical question.  Let's say we have an individual the same age, education and vocational history as this Claimant.  He's limited to medium work, as defined by the Commissioner.  That is, he can occasionally lift 50 pounds, frequently lift 25 pounds, stand and or walk with normal breaks about six hours in an eight-hour day and sit with normal breaks about six hours in an eight-hour day.  . . . I think that's what's given in the RFC in the file. Would that leave the Claimant's past relevant work?
>
> A     Yes, sir.
>
> Q     On the other hand, if we have an individual who is unable to complete an eight-hour day, five days a week due to the kind of problems the Claimant testified to,[12] that eliminates not only past work but all other work, is that correct?
>
> A     Yes, sir.

(Tr. at 541).  With that answer, Ms. McQuade completed her testimony.  (*See* Tr. at 541-42).

---

[12] Presumably, the phrase "the kind of problems the Claimant testified to" refers to the extensive physical disabilities as well as to the mental impairments that Perkins testified about at the hearing.

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that Perkins suffers from "back and hand problems," and that those conditions are "severe."  (Tr. at 40).  He also found, however, that Perkins does not have an impairment, or any combination of impairments, which meet, or equal in severity, the requirements of any applicable SSA Listing.  (*Id.*).  The ALJ determined that Perkins is capable of returning to his former work as a glass installer, service dispatcher, and shop supervisor, and that he:

> has the residual functional capacity to perform medium work as identified by the Commissioner. . . .  Specifically, the claimant can lift and or carry 50 pounds occasionally and 25 pounds frequently, stand and or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and or pull unlimited [sic] other than as shown for lift and or carry.  Furthermore, the claimant is limited in handling (gross manipulation).

(Tr. at 40-41).  Ultimately, he concluded that Perkins was not "under a 'disability,'" as defined by the Act, at any time through the date of the decision.  (Tr. at 41).  With that conclusion, he denied Perkins's applications for both DIB and SSI benefits.  (*Id.*).  That denial prompted Perkins's request for judicial review.

In this action, Plaintiff complains that the ALJ erred because his "findings of fact . . . are not supported by substantial evidence and are contrary to the law and facts."  (Complaint at 2).  In support of this argument, Plaintiff refers to both the evidence in the administrative record and to additional evidence that he filed along with his motion for summary judgment.[13]  (Plaintiff's Motion

---

[13]   After Perkins filed his complaint, his attorney withdrew from the case, and Plaintiff is now proceeding *pro se*.  In response to the court's order to file a summary judgment motion, Plaintiff filed a one-page letter, addressed to the Commissioner, which sets out  his arguments on why he should be awarded benefits.  (Docket Entry #28).  The Commissioner treats this letter as his summary judgment motion, and it has been docketed as such by the Clerk of Court.  (*Id.*).  The court applies "less stringent standards to parties proceeding *pro se* than to parties represented by counsel and liberally construe[s] the briefs of *pro se* litigants."  *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir. 2004) (citing *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995); *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir.1993)); *accord Johnson*

at 1).  In his motion, Plaintiff contends that the ALJ's findings on his residual functional capacity are incorrect.  (*Id.*).  Specifically, he claims that he is unable pick up and carry 25 pounds of weight any further than a few feet, and, then, only with great difficulty.  (*Id.*).  He also states that he has constant back pain and hip pain on both sides, as well as pain in his right knee.  (*Id.*).  He claims that the pain in his hands is so severe that it is almost impossible to do anything which requires their use.  (*Id.*).  In addition, he points out  that the evidence shows that he suffers from severe depression and an anxiety disorder, that he has attempted suicide three times, and that he has panic attacks.  (*Id.*).  He also claims that he has seizures if he does not take his medication.  (*Id.*).  Finally, he complains that he suffers from hypertension and Hepatitis C, and that he had Hepatitis B when he was 20 years old.  (*Id.*).  In sum, Plaintiff argues that the evidence of these medical conditions supports a finding that he was, in fact, disabled and entitled to an award of benefits.  (*Id.*).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).  It has also been established that section 405(g) permits remand for additional evidence "only upon a showing that there is new evidence which is material and that there is good cause [for] the failure to incorporate such evidence in the record."  *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984).  Perkins apparently hopes that the court will consider the

---

*v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007).  In this case, then, the court must construe Plaintiff's motion with the consideration afforded to any parties who proceed without counsel.

additional evidence, but he has not made the requisite showing.  Further, most of the medical records at issue are dated well after the date of the ALJ's decision, which is outside the scope of this review.  *See* 20 C.F.R. §§ 404.970, 416.1476  (new evidence will not be considered unless it relates to the period before the administrative law judge made his decision).  Under these circumstances, the court must ignore the newly submitted evidence, and consider, instead, only that evidence that the ALJ had before him when he made his decision.

At step two of his analysis, the ALJ found that Perkins had back and hand problems, and he found that those impairments were severe.  (Tr. at 35).  He also found, however, that the record did not support a finding that Perkins suffered from hip or knee problems or from any mental impairment that could be categorized as "severe."  (Tr. at 35, 37, 39).  An impairment is "severe" if it "significantly limits an individual's physical or mental ability to meet the basic demands of work activity."  *Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000) (citing 20 C.F.R. § 404.1520(c)).  The first issue, then, is whether the ALJ erred in determining that none of Perkins's hip pain, knee pain, or mental impairments is severe for purposes of social security benefits.

Although, in his motion, Perkins claims that he suffers from pain in his hips and in his right knee, the ALJ found that there was "no evidence of major dysfunction of the claimant's hips or right knee."  (Plaintiff's Motion at 1; Tr. at 37).  Indeed, the record is very sparse, aside from Perkins's own reports, on any impairment to his hips or his knees.  In fact, on March 21, 2003, an x-ray, taken on Dr. Sabatini's orders, revealed no abnormalities in Perkins's hips and right knee.  (Tr. at 393).  On March 28, 2003, Dr. Randall reported that these same x-rays showed "well preserved articular cartilage" in his hips and right knee, and that there were no fractures in his knee.  (Tr. at 367).  Dr. Randall also found that Perkins had a "fluid range of motion of his hips."  (*Id.*).  Dr. Randall appears

to have treated Perkins's reported hip pain as a by-product of his lower back pain.  (Tr. at 367, 370). As to knee pain, Dr. Randall found that Perkins had a zero-to-120 degree range of motion and stable ligaments, a "trace of an effusion," medial joint line tenderness, and a "mildly positive McMurray's." (Tr. at 367).  Dr. Randall prescribed physical therapy for Perkins's lower back, hand, and right knee pain, which resulted in his knee "feeling better," as well as in some improvement to his back pain.   (Tr. at 370, 380).   On April 7, 2004, Perkins complained to Dr. Sabatini about hip pain, in addition to pain in his back, hand, and finger, and Dr. Sabatini prescribed pain medication. (Tr. at 483).  The remainder of the medical records in evidence do not address hip or knee pain. Certainly, the scant evidence that does exist on these claims of impairment supports a finding that Perkins's hip and knee pain were not "severe."   That is, nothing shows that these impairments significantly limited Perkins's ability to meet "the basic demands of work activity."  *See Loza*, 219 F.3d at 392.  For this reason, the ALJ's findings on these impairments are supported by substantial evidence, and they should not be disturbed.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452.

Having found that Perkins suffered from back and hand problems that qualified as "severe," but that did not meet or equal one of the Listing impairments, the ALJ went on to consider Plaintiff's residual functional capacity.  A person's residual functional capacity is determined by combining a medical assessment of his impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work.  *See Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).  Here, a state medical consultant determined that Perkins retained the residual functional capacity to perform medium work, with limited handling.[14]  (Tr. at 418).  Based on this

---

[14]  State agency medical consultants are physicians who are experts in Social Security disability evaluation. *See* 20 C.F.R. §§ 404.1527(f)(2)(I), 416.927(f)(2)(I).

finding, as well as on Ms. McQuade's testimony and Perkins's medical records, the ALJ determined that Plaintiff retained the RFC to lift and or carry 50 pounds occasionally and 25 pounds frequently; to stand and or walk about six hours in an eight-hour workday; and to sit about six hours in an eight-hour workday.  (Tr. at 39).   In his application for benefits, Perkins himself described the requirements of his previous work as a glass installer.  (Tr. at 157).  He explained that it involved the following:

> Installation of frames, measuring + helping other co-workers with materials + assisted when putting frames + glass together.  I was mainly a helper.

(*Id.*).  Perkins stated that, in the course of a workday, he would walk no more than four hours; stand no more than four hours; write, type, or handle small objects for one to two hours; and sit or reach for one hour.  (*Id.*).  He stated that his job did not require kneeling; crouching; crawling; or handling, grabbing, or grasping big objects.  (*Id.*).  Perkins also reported that "lifting [was] not required," but that the heaviest weight he ever had to lift weighed less than 10 pounds, and that he frequently lifted less than 10 pounds.  (*Id.*).  In addition, Perkins explained that, when he acted as a dispatcher or supervisor, he was responsible for answering the telephone, quoting prices, routing trucks, and hiring and firing employees.  (Tr. at 158).  He stated that, in that capacity, he would walk for an hour, stand for an hour, and sit for six hours in an eight-hour workday.  (*Id.*).  Further, he stated that he would sometimes write, type, or handle small objects for approximately five to six of those hours.  (*Id.*). And Perkins stated that, in his supervisory capacity, he did not have to lift or carry any objects.  (*Id.*).  Based on Perkins's own description of his job responsibilities, then, the record clearly supports the ALJ's finding that he retained the physical ability to perform his prior work.  The ALJ's determination as to Plaintiff's physical RFC, standing alone, is supported by substantial evidence

and was arrived at in accordance with the law.  For this reason, remand is not warranted on this issue.

But Perkins also complains that he suffers from disabling mental impairments, including severe depression, an anxiety disorder, and panic attacks.  (Plaintiff's Motion at 1).  Indeed, the record corroborates Plaintiff's long history of mental problems.  When Perkins was hospitalized for chemical detoxification in September, 1995, the treating psychiatrist reported that he was "depressed with crying spells, death thoughts, and feelings of poor motivation, lack of interest."  (Tr. at 196-220).  In addition, a number of records from Perkins's primary treating physician, Dr. Sabatini, dating from July, 1996, through April, 2004, document that Perkins suffered from depression, anxiety, and panic attacks, for which he was treated with therapy and medication.  (Tr. at 483-94).  Similarly, Dr. Brister, a psychiatrist who treated Perkins from July, 1996, through 1998, diagnosed him as suffering from fluctuating levels of major depression, anxiety, fatigue, poor appetite, low self esteem, suicidal thoughts, poor concentration, and short-term memory loss.  (Tr. at 222-31, 235-39).  While at the Starlite Village Hospital in 1998, for treatment for his drug addiction, Perkins was reported to have a "depressed mood," a "mid-life transition," "poor impulse control," and an inability to identify and appropriately express emotions.  (Tr. at 243-95, 318-19).  In April, 1998, Dr. Connolly, a psychologist, examined Perkins and concluded that he suffered from an "adjustment disorder, with mixed anxiety and depressed mood."  (Tr. at 256).  Later in 1998, Dr. Mehra, a psychiatrist, examined Perkins on behalf of the state, and found him to suffer from "a mildly depressed mood with a normal affect," trouble sleeping, and weight loss, but no suicidal ideas.  (Tr. at 297).  However,  Dr. Mehra also found that Perkins was suffering from a severe psychosocial condition, and gave him a GAF score of only 30.  (Tr. at 299).  In August, 1998, Dr. Shariflan

completed a PRTF for the state, in which he concluded that Perkins had a major depressive disorder, and that it was "severe." (Tr. at 301-04). From August, 2000, to July, 2003, Perkins was treated by Dr. Donskaya, another psychiatrist, who reported that he suffered from depression and anxiety, and rated his GAF at 55. (Tr. at 337-58). In October, 2003, Dr. Lehman, a psychologist, examined Perkins at the state's request, diagnosed him as suffering from a mood disorder, and gave him a GAF score of 55. (Tr. at 395-402). One month later, on November 24, 2003, Perkins was hospitalized, overnight, because he had attempted to kill himself with a rifle. (Tr. at 439, 441). On that occasion, he was diagnosed as suffering from recurrent major depression, and was assigned a GAF score of 25. (*Id.*). In December, 2003, Dr. Parikh performed a psychiatric evaluation, found Perkins to be depressed and dysphoric, diagnosed him as suffering from recurrent major depression, and gave him a GAF score of 35. (Tr. at 441-45). Dr. Parikh prescribed antidepressant and antianxiety medications, as well as counseling. (Tr. at 444, 450). In February, 2004, Dr. Lehman again interviewed Perkins on behalf of the state, and Plaintiff informed the doctor that he had recently experienced "severe depression," had attempted suicide, and "continue[d] to have suicidal thoughts." (Tr. at 425-32). In his report, Dr. Lehman stated that there had been a significant deterioration in Perkins's mental condition since their last appointment in 2003, and he lowered Plaintiff's GAF score to 45. (Tr. at 427-30). In August, 2004, Perkins was treated at the NeuroPsychiatric Center for "major depression recurrent severe with psychotic symptoms." (Tr. at 496-500).

In his written decision, however, the ALJ relied on the opinion from Dr. Hillman, who had determined, from a review of the medical records only, that Perkins suffered from a mood disorder and from panic attacks, but concluded that neither of these impairments was "severe." (Tr. at 403-16). The ALJ did not address the contemporaneous opinion from Dr. Lehman, who, unlike Dr.

Hillman, had actually examined Perkins, and concluded that his mental condition had "significantly deteriorated" between October, 2003, and February, 2004.  (Tr. at 427).  In this circuit, "the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician."  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).  The ALJ also failed to recognize that Perkins had attempted suicide in November, 2003.  (Tr. at 439, 441).  Further, the ALJ did not take into account that, just two months before the hearing, Perkins was hospitalized for four days with a diagnosis of "major depression recurrent severe with psychotic symptoms."  (Tr. at 500). And, finally,  the ALJ did not address any of the GAF scores ascribed  to Perkins, even though they fluctuated from a low of  25, to a high of 55.  More importantly, the most recent GAF assigned to Perkins was 45.  The GAF scale assigns a numeric range from 1 to 100 as a way to categorize a patient's emotional status.  *See DSM-IV* at 32.  A GAF of 41-50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.*

It is clear that an ALJ considering a claimant with a GAF of only 45 should address the issue in some manner.  If, for instance, he finds that the score does not accurately reflect the claimant's condition, or it is not supported by other evidence in the record, he should explain that as part of his decision.  In this case, the ALJ did not do so.  There is no way to know whether the ALJ would have reached a different decision if he had duly considered Perkins's GAF scores, and the attendant limitations such scores implicate.  Clearly, a low GAF score can impact one's ability to engage in competitive employment.  *See id.*  Certainly, if Perkins's score of 45, not to mention the low GAF

scores ascribed by other doctors, accurately reflects his persistent mood and functional capacity, then the ALJ should have addressed this and, if necessary, sought further evidence on the subject.

As a general rule, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane*, 731 F.2d at 1219). If he fails to do so, his decision is not supported by substantial evidence, and it is subject to reversal if the error results in prejudice to the claimant. *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557. Here, a remand is warranted so that the ALJ can address the severity of Perkins's mental condition, and, if necessary, the impact of his mental impairment, including his GAF score, on his residual functional capacity. For these reasons, the ALJ's finding that Perkins did not suffer from a "severe" mental impairment is not supported by substantial evidence.

From the record, as a whole, it is clear that Perkins is entitled to a remand so that the ALJ may properly develop the administrative record on the issue of his mental impairments, including the limitations, if any, to his RFC based on his GAF scores. The Fifth Circuit has emphasized that judicial review is necessarily focused on whether the ALJ's decision is supported by substantial evidence in the existing record. *See id*. But the court also gave force to the Social Security regulations, which provide that RFC determinations must evaluate the claimant's ability "to meet certain demands of jobs," including "mental demands, sensory requirements, and other functions." 20 C.F.R. § 404.1545(a) (2002). The regulations require such determinations to be cast in terms of a claimant's ability to perform "work activity on a regular and continuing basis." 20 C.F.R. § 404.1545 (b) (2002). As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more

29

rigorous than otherwise would be required." *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). "If prejudice results from the violation, the result cannot stand." *Id.* Clearly, Perkins's rights were affected because the ALJ abrogated his duty to consider all of the evidence and to develop the record fully as to his mental state. *See* 20 C.F.R. § 404.1545(a) (1986). For that reason, the matter must be remanded, under sentence four of 42 U.S.C. 409(g), on the issue of Perkins's mental impairments, so that the record can be developed fully, in accordance with the law, which will allow the ALJ to render a decision that is supported by substantial evidence.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **DENIED**, and that Plaintiff's Motion for Summary Judgment be **GRANTED**, in part.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have 10 business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 9th day of August, 2007.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**